NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                       :
CHRISTIANA ITIOWE,                     :
                                       :
              Plaintiff,         :   Civil Action No. 09-0696 (JAP)
    v.                                 :
                                       :
CABLEVISION SYSTEMS                    :   **OPINION**
CORPORATION,                           :
                                       :
              Defendant.         :
_____ :

PISANO, District Judge.

      This matter comes before the Court on Defendant Cablevision Systems Corporation's ("Defendant" or "Cablevision") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff Christiana Itiowe ("Plaintiff" or "Itiowe") opposes the motion. For the reasons set forth below, the Court will grant Cablevision's motion for summary judgment.

**I.    BACKGROUND**

      On September 5, 2006, Plaintiff, an African-American female of Nigerian descent, was hired to serve as a Residential Account Executive ("RAE") in Cablevision's Tinton Falls, New Jersey office. Def.'s 56.1 Statement, Ex. 4. As a RAE, she was required to go door-to-door in Monmouth County selling internet, phone and cable services to customers. Devine Cert. ¶ 4. From the beginning of her employment through July 2007, Plaintiff had a strong sales record and was not subject to any disciplinary action. *Id.* ¶ 7; Long Dep. 19:23-20:5.

      In March 2007, Plaintiff applied for an open Direct Sales Supervisor ("DSS") position at Cablevision's office in Morris County, New Jersey ("Morris office"). Itiowe Dep. 139:25-140:6. She was interviewed for the position in April 2007. Based upon a positive review by her

interviewer, John Raynolds, Plaintiff was selected as one of the two finalists for the position. Raynolds Dep. 54:11-18.  As a result, she had a second interview with Colleen Long, the Area Director.[1]

Ultimately, Long and Raynolds decided not to hire Plaintiff for the position.  Instead, they selected Ralph Gorthey, the other finalist.  Long Cert. ¶ 17; Raynolds Cert. ¶ 17.  Their stated reasons for selecting Gorthey and not Plaintiff included Gorthey's familiarity with the Morris office territory, his fluency in Spanish—which, in their view, was a valuable skill in light of the sizeable Spanish-speaking position in the area—and his demonstrated leadership skills.  Long Dep. 13:24-17:24; Raynolds Dep. 32:18-33:6.

In July 2007, Plaintiff applied for another open DSS position, this time in Cablevision's Newark office.  Malyuk Cert. ¶ 7.  Jason Malyuk, one of two individuals responsible for hiring for the position, selected eight applicants for interviews, one of whom was Plaintiff.  *Id.* ¶ 4.  Malyuk described Plaintiff's interview—which took place on July 23, 2007 and lasted approximately forty minutes, *id.* ¶ 7—as the "worst" interview he had ever done or been a part of.  *Id.* ¶ 12; Malyuk Dep. 38:17-23; 52:7-20.  He testified that Plaintiff monopolized the conversation, appeared inattentive, and otherwise failed to demonstrate good listening or communication skills during the interview.  Malyuk Dep. 38:17-42:9; 50:16-52:70.  As a result, Plaintiff was not subsequently interviewed by George Sundstrom, Malyuk's supervisor, and was not hired for the DSS position in Newark.[2]  Malyuk Cert. ¶ 21.

Beginning in August 2007, Plaintiff's performance and behavior at work began to deteriorate.  In early August, she had a confrontation with Flo Melo, another employee at her

---

[1] During that interview, Long said to Plaintiff "let me pick your brain," which she testified meant "let me get your thoughts."  Long Cert. ¶ 14; Long Dep. 22:11-13.

[2] Among the three individuals interviewed by Sundstrom, two had familiarity with the Newark sales territory and office, and all three had strong interview performances in Malyuk's view.  Malyuk Cert. ¶¶16-20.  Plaintiff testified that she has no knowledge of any of their job qualifications or performance.  Itiowe Dep. 318:25-319:3.

2

office in Tinton Falls. Devine Cert. ¶ 9. After John Devine, a DSS at the office, broke up the argument between Plaintiff and Melo, he told Plaintiff that any future outbursts at the office would not be tolerated. *Id.* ¶ 12. Plaintiff stated that she would not hesitate to confront Melo in the future, and Melo alleged three months later that Plaintiff was attempting to frighten and provoke her.[3] *Id.* ¶¶ 11, 40.

Plaintiff also failed to meet her minimum monthly sales goal in August 2007. Devine Cert. ¶ 13. At that time, all RAEs in the Monmouth office who failed to meet the 65% sales goal received a Developing Sales Representative ("DSR") Plan for the first month under the goal, and a Representative Action Plan ("RAP") for subsequent months. *Id.* ¶ 17. Thus, because Plaintiff only met 46% of her sales goal in August, she was placed on a DSR Plan in September. *Id.* ¶ 14. The Plan stated that she could be terminated if she failed to meet her monthly sales goal for four months in the calendar year. *Id.* ¶¶ 14, 17.

Plaintiff again failed to meet her monthly sales goal for October 2007. Devine Cert. ¶ 22. This time she hit 0% of her goal, and was therefore issued a RAP. *Id.* ¶¶ 22, 23. During a meeting to discuss the RAP, Devine reminded Plaintiff of her duty to write down all of her field activities and all accounts that she visited each day. *Id.* ¶ 24. The following day, Plaintiff turned in a timesheet that indicated just one sale, and that she had only knocked on the doors of six homes. Def.'s 56.1 Statement, Ex. 11. At that point, Plaintiff was advised that she must knock on more than six doors to meet the minimum expectations of the job. *Id.*

On October 26, 2007, Lou Burdo, a DSS at the Tinton Falls office, met with Plaintiff to discuss her sales and marketing activities. Devine Cert. ¶¶ 18, 22. During the course of their conversation, Plaintiff raised her voice and became argumentative with Burdo. *Id.* ¶ 18. In

---

[3] An investigation into Melo's allegations resulted in a determination that they were unsubstantiated. Fleischer Dep. 77:23-78:7.

3

subsequent emails and meetings with Jerry Fleischer, a Human Resources Manager, Plaintiff complained about the feedback she had received from Burdo as well as the "negativity" she perceived at the office. Fleischer Cert. ¶ 14; Pl.'s Supp. 56.1 Statement, Ex. J. She did not express any belief that she was being discriminated against on the basis of any protected characteristic. Fleischer Cert. ¶¶14-16; Pl.'s Supp. 56.1 Statement, Ex. J.

In early November 2007, Plaintiff had two meetings with Long. During the first meeting, Long testified that Plaintiff appeared to be sleeping. Long Dep. 43:14-44:10. In a follow-up meeting, Long addressed concerns with Plaintiff's job performance and described Plaintiff's response and attitude as defensive and belligerent. Long Cert. ¶ 18. On November 13, Devine asked Burdo to instruct Plaintiff to go to Devine's office so that they could discuss the events of the prior week and the timesheet Plaintiff had submitted that indicated that she had marketed no homes and made no sales. Id. ¶¶ 26, 31. According to Burdo, Plaintiff refused to speak with Devine, called him a "liar," and said she was going to "get him." Devine Cert. ¶ 32.

Devine then went to speak to Plaintiff. He described Plaintiff's behavior as insubordinate, unprofessional, and disrespectful, and therefore in violation of Cablevision's Policies and Procedures. *Id.* ¶ 34. Plaintiff subsequently sent a letter to Fleischer, who met with Plaintiff to discuss her complaints about her supervisors. Fleischer Cert. ¶ 20-22. She did not raise any claims that she was discriminated against on any basis, and Fleischer recommended that, while Plaintiff could continue looking within the company for an opening, she might want to consider looking outside of the company as well. Fleischer Cert. ¶ 23; Itiowe Dep. 386:7-387:9.

Following their meetings with Plaintiff, Devine and Long decided to issue her a Formal Written Reprimand. They identified her recent behavior, performance at work, and continued

4

violation of company policy as their bases for their decision. Devine Dep. 60:21-64:18; Long Dep. 35:4-10; 39:2-42:7. On November 16, 2007, they met with Plaintiff to discuss the Reprimand. Devine Cert. ¶ 36; Long Dep. 45:2-9; 68:8-12.

At or around the same time, Plaintiff sent Fleischer a letter that, among other things, alleged discrimination on the basis of race and gender.[4] Fleischer Cert. ¶ 26. In light of the allegations, Fleischer determined that an investigation was warranted. *Id.* ¶ 28. Serena Roman, a Human Resources Senior Associate based in New York, was assigned to handle the investigation. She made several phone calls and sent several emails to Plaintiff to discuss her concerns, but Plaintiff did not ultimately follow up to schedule a meeting with Roman. Fleischer Cert. ¶ 30-31.

In November 2007, Plaintiff was issued another RAP after again achieving 0% of her sales goals. Devine Cert. ¶ 43; Long Cert. ¶ 23. On December 4, 2007, she had a meeting with Devine at which he addressed her continued failure to meet her sales goals and advised her that, if she did not reach the 65% goal in December, she could be recommended for further corrective action up to and including termination. Devine Cert. ¶ 49. As of December 28, 2007, Plaintiff was trending to score below her 65% monthly sales goal. Devine Cert. ¶ 50. Because this was the fourth consecutive month that Plaintiff had failed to meet her goals, Devine requested her termination. *Id.* ¶ 51. However, prior to any termination being approved or finalized, Plaintiff went out on approved medical leave, effective December 19, 2007. Devine Cert. ¶ 52. On February 19, 2008, while still out on leave, Plaintiff resigned from Cablevision. Itiowe Dep. 280:8-12; Devine Cert. ¶ 54.

---

[4] The letter was dated November 15, 2007, but received by Fleischer days later. Fleischer Cert. ¶ 26. Long and Devine stated that their decision to issue a Formal Written Reprimand to Plaintiff was made before Fleischer's receipt of the letter. Long Cert.¶ 21; Devine ¶ 36.

5

Plaintiff was approved for medical leave in December due to her paranoid schizophrenia. Def.'s 56.1 Statement, Ex. 16. According to Plaintiff, she was diagnosed with paranoid schizophrenia in 2001. Itiowe Dep. 369:14-17. Both she and her treated psychiatrist, Dr. Jorge Bascara, testified that the symptoms of her condition, including hallucinations and delusions, do not ever completely dissipate, even with medication. Itiowe Dep. 257:11-258:4; Bascara Dep. 75:5-24. Dr. Bascara also stated that Plaintiff was often non-compliant with her medications, and, in January 2008, recommended that she take time off from work in light of her condition.[5] Bascara Dep. 78:8-84:24; 162:19-164:18.

Plaintiff's supervisors and Human Resource Manager all maintain that they were unaware of Plaintiff's paranoid schizophrenia until she went out on medical leave in December 2007, and that she did not disclose her condition or seek their assistance or any accommodation prior to that time. Devine Cert. ¶ 38; Long Cert. ¶ 13; Flesicher Cert. ¶ 35. At her deposition, Plaintiff could not recall who at Cablevision she had spoken to about her condition.[6] Itiowe Dep. 274:23-276:4; 329:11-330:17.

While still out on medical leave and prior to tendering her resignation from Cablevision, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity and the New Jersey Division on Civil Rights. Def.'s 56.1 Statement, Ex. 18. In the Charge, she alleged that the decision denying her a promotion to DSS in July 2007 was discriminatory on the basis of race, sex and national origin. *Id.* The Charge makes no mention of any alleged disability discrimination. *Id.*

---

[5] Dr. Bascara testified that he did not and would not recommend that Plaintiff quit. Bascara Dep. 164:16-18.
[6] In her opposition brief and supplemental statement of disputed facts, Plaintiff relies at various points on a declaration she submitted in which she claims to have discussed her mental health with unnamed individuals at Cablevision. These assertions, however, are directly contradicted by Plaintiff's earlier deposition testimony, and she provides neither support in the record nor any satisfactory explanation for the disparity. Accordingly, the Court will disregard Plaintiff's assertions in that regard, and will reject her attempt to manufacture issues of fact so as to preclude a grant of summary judgment in Cablevision's favor. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252-55 (3d Cir. 2007).

While Plaintiff was employed at Cablevision, the company had a zero tolerance policy against discrimination, harassment and retaliation. Fleischer Cert. ¶¶ 3, 5, 6. The Employee Handbook and harassment prevention policy, which Plaintiff received a copy of, outlines this policy and contains a procedure for employees to make complaints about workplace issues, including discrimination or harassment. *Id.* Plaintiff also received training on Cablevision's anti-harassment and discrimination policies. *Id.* ¶ 7.

On February 17, 2009, Plaintiff filed a complaint against Cablevision. In a Memorandum Opinion and Order entered on September 10, 2009, Chief Judge Garrett E. Brown, Jr. granted in part and denied in part a motion to dismiss filed by Cablevision. Plaintiff subsequently filed an Amended Complaint on September 25, 2009. Therein, she asserts numerous causes of action, including allegations of: discrimination on the basis of race, color, national origin, gender and disability in violation of Title VII, 42 U.S.C. § 1981, the Americans with Disabilities Act ("ADA"), and the New Jersey Law Against Discrimination ("NJLAD"); constructive discharge in violation of Title VII, the ADA, and the NJLAD; hostile work environment and retaliation in violation of the NJLAD; and emotional distress in violation of 42 U.S.C. § 1981a.[7] On July 8, 2011, Cablevision filed the instant motion for summary judgment.

## II.     STANDARD OF REVIEW

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the court must view the facts in the light most favorable to the

---

[7] Plaintiff's "claim" for emotional distress is not separately actionable; it is merely a basis for an award of damages if Plaintiff were to succeed in establishing intentional discrimination. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 161 (3d Cir. 1999).

non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan,* 122 F.3d 171, 176-77 (3d Cir. 1997). The Court is not to "weigh the evidence and determine the truth of the matter," but instead need only determine whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249.

The moving party bears the initial burden of demonstrating the absence of a genuine issue, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once that showing has been made, the burden then shifts to the non-moving party to identify, by affidavits or otherwise, specific facts showing the existence of a genuine issue for trial. *Id.* at 324. The non-moving party may not rest upon the mere allegations or denials of its pleadings, *id.*, and must offer admissible evidence establishing a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matushita*, 475 U.S. at 586.

### III. DISCUSSION

#### A. Failure to Promote and Failure to Accommodate Claims

In her Amended Complaint, Plaintiff alleges that Cablevision discriminated against her on the basis of her race, color, national origin, gender, and disability in violation of Title VII, 42 U.S.C. § 1981, the ADA, and the NJLAD. When addressing employment discrimination claims under these statutes, the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)(applying framework to Title VII claims); *Vulcan Pioneers of N.J. v. City of Newark*, 374 F. App'x 313, 318 (3d Cir. 2010)(Section 1981 and NJLAD claims); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007)(ADA claims). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she belongs to a

protected class; (2) she was qualified for the position at issue; (3) she was subject to adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. *Sarullo*, 352 F.3d at 797.

Once a *prima facie* case is established, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets this burden, the plaintiff then has the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.*

### 1. Failure to Promote

Plaintiff first alleges that she was discriminated against on the basis of her race, color, national origin and gender when she was denied promotions on two separate occasions by Cablevision. Specifically, she alleges that Cablevision's failure to promote her to the position of DSS at both the Morris office and the Newark office violated Title VII, § 1981, and the NJLAD because the decisions were motivated by discriminatory animus.

The *McDonnell Douglas* burden-shifting framework set forth above applies to Plaintiff's failure to promote claims. Thus, if Plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden shifts to Cablevision to proffer a "legitimate, non-discriminatory reason for its failure to promote." *Scheidemantle v. Slippery Rock Univ. State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). If Cablevision satisfies its burden, Plaintiff must then demonstrate that the proffered reason was merely a pretext for discrimination. *Id.*

Here, even assuming that Plaintiff can establish a *prima facie* case,[8] she has made no showing that Cablevision's failure to promote her to the DSS positions at issue were motivated by discriminatory animus or justified by anything other than legitimate business considerations. First, with regard to the DSS position in the Morris office, Cablevision proffered legitimate, nondiscriminatory reasons for promoting Gorthey instead of Plaintiff. Specifically, Raynolds and Long, the supervisors charged with making the hiring decision, identified Gorthey's familiarity with the Morris office territory, his fluency in Spanish—which, in their view, was a valuable skill in light of the sizeable Spanish-speaking position in the area—and his demonstrated leadership skills. *See* Long Dep. 13:24-17:24; Raynolds Dep. 32:18-33:6.

Plaintiff's arguments challenging that rationale and seeking to establish that it is merely pretextual are without merit. Indeed, although Plaintiff asserts that Long and Raynolds did not know at the time of their decision whether Gorthey had the ability to speak Spanish or had familiarity with the area, she points to no evidence in support of this contention. In fact, both supervisors testified that, at the time of their decision, they were aware of both of Gorthey's skills in that regard.[9] *See* Long Dep. 13:24-17:24; Raynolds Dep. 32:22-35:5. Additionally, although Plaintiff contends that the stated criteria for promotion to DSS did not include the

---

[8] In light of the "low bar for establishing a *prima facie* case of employment discrimination," the Court will focus its analysis on the second and third stages of the *McDonnell Douglas* framework. *Scheidemantle*, 470 F.3d at 539; *see, e.g., Ezold v. Wolf,* 983 F.2d 509, 523 (3d Cir. 1993) (explaining that the second and third stages of the *McDonnell Douglas* framework should normally be the focus of the analysis and concluding that "[b]ecause the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.") (internal citations omitted); *Genevie v. Jackson*, 2008 WL 793885, at *12 (W.D. Pa. Mar. 24, 2008). The Court notes, however, that although the first three elements of Plaintiff's *prima facie* case are met in this case, Plaintiff's assertion that the fourth element is undisputed and easily satisfied is without merit; indeed, as Cablevision argues, Plaintiff has provided very little evidence to support a finding that Cablevision's decisions were made in "circumstances that raise an inference of discriminatory action." *Sarullo*, 352 F.3d at 797; *see Rene v. Lidestri Foods, Inc.*, 2010 WL 4807050, at *6 (D.N.J. Nov. 17, 2010)("a prima case must support the inference that Plaintiff was discriminated against because of his race, color, or national origin – it is not prima facie discrimination to simply be a member of a protected class who is subjected to a negative employment decision").

[9] Moreover, Plaintiff admitted that she had no familiarity with Gorthey's qualifications, Itiowe Dep. 143:10-24, and neither Raynolds nor Long knew at the time of their decision that Plaintiff was Nigerian or that she had a disability. Raynolds Cert. ¶ 7; Long Cert.¶ 12.

ability to speak Spanish or have familiarity with the area, Raynolds and Long were free to consider relevant skills and attributes beyond the minimum requirements for the position. *See, e.g.*, *Dungee v. N.E. Foods, Inc.*, 940 F. Supp. 682, 689 (D.N.J. 1996)("the existence of baseline requirements . . . does not preclude an employer from considering additional, legitimate qualifications . . . and then deciding who is most capable of performing the job."); *Bloomfield v. Vizcaya*, 1999 WL 675966, at *6 (S.D.N.Y. Aug. 31, 1999)(employer properly took into consideration additional qualifications, including Spanish fluency, that were not part of the job description). Thus, because Plaintiff cannot demonstrate that Cablevision's proffered reasons were merely a pretext for discrimination or otherwise unworthy of credence, her failure to promote claim as to the DSS position at the Morris office fails. *Id.*

Cablevision is also entitled to summary judgment on Plaintiff's failure to promote claim with regard to the DSS position at the Newark office. After applying for that position in July 2007, Plaintiff was interviewed by Jason Malyuk, one of two individuals responsible for hiring. Malyuk Cert. ¶ 7. Malyuk described Plaintiff's interview as the "worst" interview he had ever conducted or been a part of, and specifically noted that Plaintiff monopolized the conversation, appeared inattentive, and otherwise failed to demonstrate good listening or communication skills. *Id.* ¶¶ 12-13; Malyuk Dep. 38:17-42:9; 50:16-52:70. Thus, on that basis, Plaintiff was not advanced in the interview process and was not awarded the DSS position in Newark.

In an attempt to manufacture a showing that Malyuk was motivated by discriminatory animus and that the proffered reason for Cablevision's hiring decision is pretextual, Plaintiff advances a number of arguments. First, she asserts that Cablevision failed to provide a specific justification for its decision. That argument, however, is belied by the stated reasons provided by Malyuk and detailed above. *See* Malyuk Cert. ¶¶ 12-13; Malyuk Dep. 38:17-42:9; 50:16-52:70.

Next, Plaintiff suggests that the individuals who were promoted to the open DSS positions in Newark, both of whom are Hispanic, were selected because Malyuk is also Hispanic. However, that is simply not true, as Malyuk is not in fact Hispanic. *See* Second Fleischer Cert ¶ 2. Additionally, Malyuk further explained that, of the three individuals ultimately considered for the positions, two had familiarity with the Newark sales territory and office, and all three had strong interview performances. *See* Malyuk Cert. ¶¶16-20. Thus, Plaintiff's argument ultimately amounts to no more than her own subjective evaluation of her credentials as compared to the other candidates for the position. Although she may disagree with the promotion decision that Cablevision ultimately made, she has provided no evidence of pretext, and it is not the "court's role to second-guess an employer's business judgment as to who is more qualified for the job." *Dungee*, 940 F. Supp. at 689; *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."). Accordingly, Cablevision is entitled to summary judgment on Plaintiff's failure to promote claims.

### 2. Failure to Accommodate

Plaintiff also asserts a claim under the ADA, alleging that Cablevision failed to accommodate her known or perceived disabilities. Specifically, she contends that she became ill with asthma and bronchitis numerous times during the course of her employment, and that, despite these illnesses, Cablevision failed to accommodate her requests to transfer to another position within the company.

To establish a *prima facie* case for failure to accommodate, a plaintiff must show that: (1) she is an individual with a disability within the meaning of the ADA; (2) she can perform the essential functions of the job, with or without reasonable accommodations by the employer; and

(3) she has suffered an adverse employment decision as a result of discrimination. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)(internal citations omitted).

Here, as an initial matter, Plaintiff has failed to adequately plead a failure to accommodate claim. Indeed, in her Amended Complaint, she makes only one reference that can conceivably be construed as an attempt to assert such a claim, alleging that "while sick with acute bronchitis and acute asthma, Plaintiff requested Defendant's Human Resources to transfer her to another office or division . . . Defendant refused to accommodate Plaintiff's requests." Am. Compl. ¶ 22. However, that alone is insufficient to plead a failure to accommodate claim under the ADA. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 n.1 (3d Cir. 1997)(a court need not "read in" a cause of action for failure to accommodate where a plaintiff has failed to plead one, "even when the complaint's background section makes a brief reference to failure to accommodate").

Moreover, even looking beyond the pleading deficiencies, Cablevision is entitled to summary judgment on Plaintiff's claim. With regard to the first element of her *prima facie* case, Plaintiff does not set forth evidence or case law that would support a finding that her asthma and bronchitis[10] actually constituted a disability within the meaning of the ADA. *See Williams*, 380 F.3d at 762 (outlining definition of "disability" under the ADA, which requires, *inter alia*, demonstration of an impairment that substantially limits one or more major life activities); *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999)(asthma not considered disability under pre-2008 ADA). Similarly, she offers no competent evidence demonstrating that she ever actually

---

[10] Plaintiff does not allege or argue that Cablevision failed to accommodate her paranoid schizophrenia. She does, however, allege in her Amended Complaint that she suffers from a disability as a result of her asthma, bronchitis, *and* paranoid schizophrenia. Nevertheless, Plaintiff did not identify any accommodation that she did or would have requested in connection with that condition, and Plaintiff's supervisors and HR Manager all certify that they were unaware of Plaintiff's paranoid schizophrenia until she went out on medical leave in December 2007. Devine Cert. ¶ 38; Long Cert. ¶ 13; Flesicher Cert. ¶ 35. Similarly, at her deposition, Plaintiff could not recall who, if anyone, at Cablevision she had spoken to about her condition. Itiowe Dep. 274:23-276:4; 329:11-330:17.

requested an accommodation for any of her conditions[11] or that an accommodation would have been warranted under the circumstances. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)("the employer must know of both the disability and the employee's desire for accommodations for that disability"); *Hove v. Cleary*, 2011 WL 2223760, at *4 (D.N.J. June 6, 2011)("While a request for accommodation need not be formal or even made with a specific accommodation in mind, the request must nevertheless be made."). Accordingly, Cablevision is entitled to summary judgment on Plaintiff's failure to accommodate claim.

    B. Hostile Work Environment

In her Amended Complaint, Plaintiff also alleges that she was subjected to a hostile work environment during her employment at Cablevision. As the basis for her claim, she sets forth a variety of allegations involving comments and conduct by her supervisors and co-workers that she claims were discriminatory and harassing.

In order to prevail on a hostile work environment claim under the NJLAD, a plaintiff must demonstrate that the defendant's conduct: (1) would not have occurred but for the plaintiff's protected status; and that (2) the conduct was severe or pervasive enough to make (3) "a reasonable [person of the same protected class] believe that the (4) conditions of employment are altered and the working environment is hostile or abusive." *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 604-05 (1993); *see also Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001) (explaining that a hostile work environment claim under NJLAD closely resembles and includes the same basic elements as a Title VII hostile work environment claim).

---

[11] At her deposition, Plaintiff could not explain what accommodations she might have requested or what accommodations might have been appropriate. Itiowe Dep. 319:24-329:15. She attempts to argue that her doctor recommended that she seek an indoor position and that she made such a request to Devine, *see* Itiowe Decl. ¶ 47, but she offers no evidence in support of those claims beyond her own, self-serving declaration. Moreover, when Plaintiff took time off from work in April 2007 due to asthma and bronchitis, she was informed that she was eligible for Cablevision's non-FMLA leave. Mocciola Dep. 6:7-11:12. She did not, however, take that leave, and there is no evidence demonstrating that she requested any additional leave or accommodations for asthma or bronchitis at any later point in her employment. *Id.* 35:20-40:16; Def.'s 56.1 Statement, Exs. 7, 31.

Here, as a threshold matter, the vast majority of the comments and conduct that Plaintiff alleges in support of her claim are not suggestive of discrimination and thus fail to satisfy the first element of her *prima facie* case. *Lehman*, 132 N.J. at 604-05. Indeed, although Plaintiff asserts that various individuals at Cablevision taunted her and made comments in reference to her paranoid schizophrenia, she provides no competent evidence that any of the alleged harassers were even aware that she suffered from that condition.[12] Thus, the specific conduct that she identifies as the basis for these allegations—for example, Long's statement to Plaintiff "let me pick your brain" or Burdo's statement that Plaintiff needed to "clear her head"—cannot be said to have been based on her alleged disability.

Likewise, nearly all of the remaining allegations that comprise Plaintiff's hostile work environment claim involve innocuous comments and conduct with no apparent relation to any protected category. For example, Plaintiff alleges that she was encouraged by various individuals to resign or seek employment outside of Cablevision, but gives no indication as to how those alleged suggestions were motivated by discriminatory animus. *See Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 558-59 (3d Cir. 2009)(supervisor's comments to employee attempting to force employee to resign do not show discriminatory motivation). Similarly, she contends that she was the only employee at Cablevision to be denied a requested reference letter, but does not offer evidence supporting that contention or demonstrating how the decision was based on her protected status.[13] Although she does identify a variety of disagreements and

---

[12] As noted above, Plaintiff's supervisors and HR Manager all certify that they were unaware of Plaintiff's paranoid schizophrenia until she went out on medical leave in December 2007. Devine Cert. ¶ 38; Long Cert. ¶ 13; Flesicher Cert. ¶ 35. Moreover, at her deposition, Plaintiff could not recall who at Cablevision she had spoken to about her condition or when she might have mentioned it. Itiowe Dep. 274:23-276:4; 329:11-330:17; *see also supra* note 6. She also attempts to assert that she disclosed her paranoid schizophrenia in her employment application, but she testified that the "illness" she references on her application actually relates to headaches she was suffering from at the time. Itiowe Dep. 180:18-181:17.

[13] Moreover, Cablevision explained that it has a longstanding policy against providing references and letters of recommendation to current employees. *See* Long Dep. 20:6-21:3; Fleischer Dep. 34:6-21.

incidents with co-workers at Cablevision, particularly Melo and Burdo, she does not set forth any competent evidence indicating that discriminatory animus played any role in those incidents.[14] *See Brooks v. CBS Radio*, 342 F. App'x 771, 776 (3d Cir. 2009)(the law does not represent "'a general civility code for the American workplace' and instead provides relief only to employees who suffer severe or pervasive harassment because of a reason prohibited" by the law); *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 854, 865 (D.N.J. 2002)(dismissing claim based upon failure to produce any evidence "that the facially neutral conduct of [plaintiff's] supervisors and co-workers masked a discriminatory intent").

In addition to being nearly entirely comprised of alleged comments and conduct unrelated to any protected category, Plaintiff's hostile work environment claim does not rise to the level required to withstand summary judgment. Indeed, no reasonable jury could conclude that the conduct that Plaintiff alleges, viewed in its totality, was severe or pervasive enough to make "a reasonable [person of the same protected class] believe that the conditions of employment are altered and the working environment is hostile or abusive." *Lehman*, 132 N.J. at 604-05. In that regard, Plaintiff's allegation that her co-workers sang "who is the black sheep, where is the black sheep" in her presence[15]—the only allegation that appears to involve conduct arguably related to a protected category[16]—is insufficient to sustain her claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)("'simple teasing,' offhand comments, and isolated incidents (unless

---

[14] Plaintiff's allegations about performance-related issues and the different requirements that her supervisors imposed on her are similarly deficient and unrelated to any protected category. *See, e.g., Ponton v. AFSCME*, 395 F. App'x 867, 874 (3d Cir. 2010)(poor evaluations insufficient to support hostile work environment claim).

[15] Although Plaintiff appears to claim that her co-workers sang this on numerous occasions when she walked by, she testified at her deposition that this occurred only once, and that she did not know who was singing. *See* Itiowe Dep. 390:12-393:3.

[16] Plaintiff also alleges that Cablevision failed to investigate all but one of her complaints of discrimination and harassment, but that contention is not supported by the evidence. Indeed, Fleischer met with Plaintiff numerous times upon learning of her complaints. *See, e.g.*, Fleischer Cert. ¶¶ 14-22. Moreover, the letter Plaintiff sent to Fleischer dated November 15, 2007, was the first correspondence that included an allegation of discrimination, and Fleischer followed up by commencing an outside investigation. *See id.* ¶¶ 26, 28.

16

extremely serious)" do not constitute hostile work environment)(internal citations omitted); *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 287 (3d Cir. 2010)(six alleged discriminatory comments and incidents were not sufficiently severe or pervasive to sustain hostile work environment claim); *Scott v. Graphic Comm'ns Int'l Union*, 92 F. App'x 896, 904 (3d Cir. 2004); *Feeney v. Jefferies & Co.,* 2010 WL 2629065, at *5 (D.N.J. June 28, 2010)(finding that plaintiff's allegation that his supervisor "repeatedly" made inappropriate comments related to his Irish ancestry was not enough to sustain a hostile work environment claim). Accordingly, because the vast majority of Plaintiff's allegations are not suggestive of discrimination, and, in any event, do not constitute severe or pervasive harassment, Plaintiff's hostile work environment claim cannot withstand summary judgment.

### C. Constructive Discharge

Largely relying on the allegations set forth in support of her hostile work environment claim, Plaintiff also asserts that she was constructively discharged in violation of Title VII, the ADA, and the NJLAD. She contends that the conditions at Cablevision were so intolerable that she was forced to resign in February 2008, two months into her approved medical leave.

In assessing whether an employee can recover on a claim of constructive discharge, the Court must determine "whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502-03 (3d Cir. 2010)(quoting *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167 (3d Cir. 2001)). In other words, the Court must "find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir. 1984).

Here, as an initial matter, Plaintiff has made no showing as to why the conditions *at the*

*time of her resignation*—namely, two months into her approved medical leave with another four months of leave remaining—were so intolerable that she had no choice but to resign. *See, e.g., Shepherd v. Hunterdon Dev. Ctr.*, 174 N.J. 1, 24 (2002); *Ramos v. Pharmaceutical Formulations, Inc.*, 2007 WL 92582, at *5 (N.J. Super. App. Div. 2007)(alleged harassment "must be intolerable at the time of . . . plaintiff's resignation.").

Moreover, the allegations and arguments that she does raise in support of her claim fall far short of the level required for a reasonable jury to conclude that she was constructively discharged. *See Colwell*, 602 F.3d at 502-03. Indeed, Plaintiff almost exclusively relies on the arguments that the Court considered and rejected in connection with her hostile work environment claim,[17] and provides no additional evidence indicating that the conditions that she alleges were the result of or motivated by discrimination. *See Swingle v. Novo Nordisk, Inc.*, 2009 WL 2778106, at * 5 (D.N.J. 2009)("The constructive discharge standard envisions working conditions that are 'outrageous, coercive and unconscionable' and requires conduct more egregious than that necessary to satisfy a hostile work environment claim."); *Shepherd*, 174 N.J. at 28 (because plaintiff's showing with regard to the hostile work environment claim was minimal, he cannot survive summary judgment under heightened constructive discharge standard). Furthermore, Plaintiff's assertion that her psychiatrist, Dr. Bascara, advised her to resign is contradicted by the record: at his deposition, Dr. Bascara specifically testified that he did not tell Plaintiff to resign. *See* Bascara Dep. 163:20-164:18. Accordingly, because a

---

[17] *See supra* III(B). In fact, Plaintiff repeatedly attaches labels such as "hostile work environment," "hostile situation," and "hostility" to describe the conditions at Cablevision, but provides no factual or legal support to substantiate her claim. Her allegation that she made management aware of her mental illness is not supported by competent evidence, and although she alleges later in her brief that she was advised to consider looking for employment outside of Cablevision, those alleged suggestions occurred many months before she voluntarily resigned, have no indicia of discrimination, and, in any event, do not provide sufficient support to sustain her constructive discharge claim. *See, e.g.*, *Angeloni v. Diocese of Scranton*, 135 F. App'x 510, 513 (3d Cir. 2005); *Taylor v. Brandywine Sch. Dist.*, 202 F. App'x 570, 575 (3d Cir. 2006); *Jaworksi v. N.J. Tpk. Auth.*, 2008 WL 4139375, at *8 (D.N.J. July 25, 2008).

reasonable jury could not find that Cablevision "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign," Plaintiff's constructive discharge claim cannot withstand summary judgment. *Colwell*, 602 F.3d at 502-03.

      D.  <u>Retaliation</u>

Finally, Plaintiff asserts a claim for retaliation under the NJLAD. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Moran v. DaVita Inc.*, 441 F. App'x 942, 946 (3d Cir. 2011) (citing *Lawrence v. Nat'l Westminster Bank,* 98 F.3d 61, 71 (3d Cir. 1996)). Once that showing has been made, the defendant must articulate a legitimate, non-retaliatory reason for its actions. *Id.*

Here, Plaintiff has not established a *prima facie* case of retaliation. In support of her claim, the only adverse employment action she alleges is the Formal Written Reprimand she received in November 2007. However, because there is no evidence that the Reprimand resulted in any material change in the terms or conditions of Plaintiff's employment, it cannot be characterized as adverse employment action. *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir. 2001)(written reprimands, without accompanying material change in the terms and conditions of plaintiff's employment, cannot constitute adverse employment action); *Dooley v. Roche Labs., Inc.*, 2007WL 556885, 9 -10 (D.N.J. Feb. 15, 2007). Moreover, there is no basis for concluding that the issuance of the Reprimand was retaliatory or would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hanani v. N.J. Dep't of Envtl. Prot.*, 205 Fed. App'x 71, 80 (3d Cir. 2006)(internal citation omitted). Accordingly, Cablevision is entitled to summary judgment on Plaintiff's retaliation claim.

## IV. CONCLUSION

For the reasons above, Cablevision's motion for summary judgment is granted. An appropriate Order will follow.

/s/ JOEL A. PISANO
United States District Judge

Dated: February 21, 2012